ALBERT F. DAMON v. THE BALT. & PHIL. R. CO.

APPEAL FROM DECREE OF THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, IN EQUITY.

Argued February 7, 1888—Decided March 19, 1888.

1. The prohibitive words of § 10, act of February 19, 1849, P. L. 83, forbidding railroads from passing through "any dwelling-house," etc., embrace that portion of the curtilage which is necessary to the enjoyment of the dwelling-house, but not such part as may be merely desirable or convenient, depending upon the will of the owner: Swift and Given's App., 111 Pa. 516, discussed.

2. Where the land taken by a railroad company, at its nearest point was more than 100 feet distant from and not within the same inclosure with the dwelling; the carriage-way unchanged and access not materially interfered with; no out-buildings taken, and the barn, fifty feet distant from the road, not cut off from the dwelling, and an ample remedy in damages for every matter of inconvenience and injury existing, it was not error to dismiss a bill filed by the owner to restrain the occupation by the railroad company.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 156 January Term 1887, Sup. Ct.; court below, No. 1 March Term 1885, C. P. in equity.

On December 15, 1884, a bill in equity was filed by Albert F. Damon against the Baltimore and Philadelphia R. Co., averring the ownership by the plaintiff of a country-seat in Darby township, the threatened invasion of the same by the defendant company, with irreparable injury to the plaintiff, praying for a preliminary injunction until hearing and perpetual injunction thereafter. The preliminary injunction moved for was refused, and on appeal by the plaintiff to this court, the justices sitting being equally divided in opinion, on March 2, 1885, the appeal was dismissed.

The hearing then proceeded before *Mr. John T. Reynolds,* appointed master and examiner, who on October 2, 1886, filed a report of his findings of fact and of law, which was as follows:

From the evidence presented as aforesaid the master and examiner finds: That Albert F. Damon, the plaintiff, is the owner and occupant of a dwelling-house and country-seat situate in Darby township, Delaware county. The premises comprise about forty acres of land, and have been owned by the plaintiff for twenty-six years last past. The dwelling is mainly of brick. To the original building, which is perhaps a century old, additions have been made and improvements therein effected, from time to time, until the structure, while in no sense elegant, is yet commodious and convenient, and altogether a very desirable country home. There is also a large stone and frame barn and two-story spring-house, good buildings, in keeping with the general character of the place. The spring-house is in front of the dwelling, at the foot of the knoll upon which the latter is situated, and about two hundred and twenty feet distant, with a board walk between. From the spring, water is supplied to the dwelling by means of a hydraulic ram. The only approach to the dwelling is by a private lane or carriage-way leading in from the Darby road, which carriage-way from a distance of perhaps four hundred feet from the dwelling-house rises at a moderate grade to the house, where it turns and continues to the barn, about sixty feet away. The pipes from the hydraulic ram to the dwelling run parallel with this carriage-way, and near to it. Upon the one side of this carriage-way is the spring-house before mentioned, and a small inclosure, part of which is used as a tennis ground and the remainder filled with fruit trees, the two being separated by merely a terrace. Upon the other side, and also inclosed, is a garden of considerable extent, from which the families of the plaintiff and his son have been supplied with vegetables and fruit. From the barnyard a small lane led to a trough below the spring-house, supplied with water from the spring. To this trough the cattle came by the lane aforesaid for water.

The defendant, a corporation created under the general railroad acts of 1849 and 1868 has constructed a railroad across

and upon the lands of the plaintiff aforesaid, the right of way claimed therefor being seventy feet in width. The said railroad is in front of the plaintiff's dwelling, and is located upon an embankment which crosses about the center of the garden aforesaid, destroys a small corner of the terrace at the end of the lawn tennis ground, and occupies a greater part of the remainder of the same inclosure containing fruit trees. It separates the spring-house from the dwelling and the barn, passing very close to the latter. It is one hundred and ten feet from the dwelling to the nearest line of this embankment and one hundred and thirty-eight feet to the track. The carriage-way is spanned by a bridge about ten feet in height and with a width between walls of twenty feet. This carriage-way has not been changed, but it is proposed by the defendant to lower its grade by excavation at the bridge, so as to give at that point a clear height of eleven or twelve feet. This change of grade will not, in the opinion of the master, materially affect or render more difficult the approach to the dwelling. The route through the property of the plaintiff was chosen from several surveys made as being the most practicable because of its doing the least damage not only to the property of the plaintiff, but also to other properties for several miles on either side thereof; also because of favorable topographical features.

Section 10, act of February 19, 1849, is as follows: "The president and directors of such company shall have power by themselves, their engineers, superintendents, agents, artisans, and workmen, to survey, ascertain, locate, fix, mark and determine such route for a railroad as they may deem expedient, not, however, passing through any burying ground or place of worship, or any dwelling-house in the occupancy of the owner or owners thereof, without his, her, or their consent." Has the construction of the railroad as aforesaid been in violation of the provisions of the act just cited? This is the only question in the cause. Its proper determination rests upon a proper interpretation of the words of the act. This interpretation, the plaintiff contends, should be fullest in favor of the land owner, and that anything short of this would but defeat the manifest purpose of the legislature in imposing such a restriction. He submits, therefore, that the word "house" as used in the act should be taken to mean not merely the inclosure of the four

walls of a dwelling, but "such amount of land surrounding it as would afford a reasonable enjoyment and occupation of the house, together with the necessary and convenient access to the same from the public highway—in short that the curtilage is part of the house." In support of this he cites a number of cases determined in both the English and American courts, involving the Land Clauses Consolidation Act, 8 & 9 Victoria, the Mechanics' Lien Laws, and the criminal law, wherein the word "house" has received the construction thus contended for; claiming that under these decisions, the defendant having constructed its railroad through the curtilage of the plaintiff, has taken for its purposes that which is exempt by act of assembly. To this the defendant makes answer that the gardens and other lands of the plaintiff occupied by its railroad are in no wise a part of the house, that they lack even the essential feature of a curtilage appurtenant to a dwelling, viz., that it should be in the same inclosure with the house, and that in construing the term "house" it is no aid to inquire as to what passes by implication in the conveyance or devise of a dwelling-house, nor as to the width of significance of the word as it appears in the Mechanics' Lien Laws; since in the one case the extent of the conveyance or devise depends upon the intention of the parties, and, in the other, the ground adjacent to the building and necessary for its reasonable enjoyment is expressly included within the application of the lien. The defendant also cites the acts of incorporation of various railroad companies, wherein the terms "dwelling-house" and "out-buildings" are used distinctively and in no wise synonymously.

In the determination of this cause, however, we are happily relieved from dependence upon any of the authorities cited, which at best have but an indirect application. The Supreme Court has very recently, in Swift and Given's Appeal, 111 Pa. 516, interpreted for us that portion of the act of 1849 before cited, as follows : " It certainly does not mean that the prohibition extends only to the preventing the railroad from actually passing 'through' the dwelling-house. When the latter is occupied by the owner thereof, the statute gives it all the protection necessary for its reasonable enjoyment as a dwelling for the owner and his family. This necessarily includes some

curtilage connected therewith. The exact extent of that curtilage cannot be defined by any arbitrary rule as to distance. As each case arises, the right of the owner and occupier of the dwelling-house, against the hostile location of a railroad, must be determined by a consideration of what is necessary for a reasonable and proper enjoyment of the house as a residence in view of its location and surroundings."

Judged by this rule we do not think the construction of the railroad as aforesaid is in violation of the statutory provision. The facts of the case under consideration are, to be sure, very much more in favor of a different conclusion than were the circumstances of Swift and Given's appeal. The location of the railroad in question is in front of the dwelling and near to it. It occupies a large part of the vegetable garden in cultivation. It crosses the carriage-way leading to the dwelling, separates the latter from the spring-house, crosses some ground planted with fruit trees, which are thereby destroyed, occupies a cattle lane leading from the barn to the spring-house, and passes within a few feet of the corner of the barn. That great damage has been done to the plaintiff's property there is no doubt, and yet does the situation come within the prohibition of the act? The railroad is at the nearest point more than one hundred feet from the dwelling, and in the opinion of the master does not materially interfere with the access thereto. The route of the carriage-way is unchanged, and when the grade is altered as proposed, the approach to the dwelling will practically be as good as heretofore. The distance to the spring-house, passing down the carriage-way, and under the railroad bridge, has not been materially increased, nor the way thereto made more difficult, nor has the use of the spring-house been otherwise interfered with. The foot of the embankment slope is within five feet of the barn wall. The track of the railroad is at the nearest point fifty feet distant from the barn. Further than this the use of the latter is not interfered with. The risk of fire from passing engines, or the possibility of horses being frightened thereby, is not, we think, such an interference with use as is prohibited by the act. The latter, in the master's opinion, must be such an interference as amounts to almost absolute destruction.

The obstruction of the cattle lane will necessitate, either the

expenditure of more labor in raising water in the barnyard for
the use of the stock, or the employment possibly of additional
help to bring the stock by the carriage-way to the trough at
the spring.    The use of the latter has been made inconvenient,
but it is inconvenience only, and not deprivation.   The vege-
table garden and ground occupied by fruit trees are, as to the
dwelling, separate and distinct inclosures.    They are, there-
fore, not a part of the curtilage which Bouvier defines as " the
inclosed space immediately surrounding a dwelling-house, con-
tained within the same inclosure," and hence, even in view of
the contention of the plaintiff, are no more exempt from occupa-
tion by a railroad than any other portion of the plaintiff's grounds
more remote from the dwelling.   For the property in ques-
tion, the plaintiff, by reason of the quiet and comfort afforded,
as also the fact that children and grandchildren have there grown
up, and are growing up about him, has very naturally formed
a strong attachment, and money would therefore afford but
very inadequate compensation for the very great injury sus-
tained by the construction of the railroad as aforesaid.   But,
unfortunately, this is the only medium of compensation known
to law.    Even the violation of the most tender and sacred re-
lations is measured by the same standard.   To prevent the
construction of a railroad as located upon the ground of the
plaintiff, would be to exclude such public improvements prac-
tically from all populous districts.   We do not think the pro-
hibition of the act is so far-reaching as contended for by the
plaintiff.   For all expenses, inconvenience, and damage sus-
tained by him he is entitled of course to compensation under
the act.

Exceptions having been filed before the master, he made a
supplementary report finding the following facts in addition :

1. That the spring-house of the plaintiff is used by him
for the storage of milk, butter, and fruit used by the family,
and that the pipes through which the water from the spring
is shipped to the dwelling are covered by the railroad embank-
ment.

2. That the occupation of the premises of the plaintiff is
without plaintiff's consent.   There is in evidence no declara-
tion of this fact, but the inference from the whole proceeding

is, in the opinion of the master, sufficiently strong to warrant his finding, as such.

Further than the foregoing the master sees no reason to add to or otherwise change his report.

The report as modified, with the exceptions, then came on for final hearing, and on December 6, 1886, the court, CLAYTON, P. J., confirmed the report and entered a decree dismissing the bill. Thereupon the plaintiff took this appeal, specifying many closely related errors, the most important of which were the following:

2. The learned court erred in affirming the report of the master, because said report is based upon the finding of the master that the only medium of compensation known to the law is damages for the interference with the quiet and comfort of the plaintiff's home and dwelling-house, the master using this language: "For the property in question the plaintiff, by reason of the quiet and comfort afforded, as also the fact that children and grandchildren have there grown up, and are growing up about him, has very naturally formed a strong attachment, and money would therefore afford but very inadequate compensation for the very great injury sustained by the construction of the railroad as aforesaid. But unfortunately this is the only medium of compensation known to the law."

6. The learned court erred in affirming the report of the master, as one of the elements thereof was his opinion that the term "curtilage" was restricted to "the enclosed space immediately surrounding a dwelling-house contained within the same enclosure," and that as the plaintiff's vegetable garden and ground occupied by fruit trees, were as to the dwelling separate and distinct inclosures, they were therefore not a part of the curtilage.

*Mr. Henry K. Fox* (with him *Mr. V. Gilpin Robinson*), for the appellant:

1. The law recognizes no such element in the recovery of damages as compensation for the injury to the plaintiff's feelings, health and happiness, by the invasion of the privacy of his home: Wood's Railway Law, 905; Tufts v. Charleston, 4 Gray 537; Somerville etc. R. Co. v. Dougherty, 22 N. J. (L.) 495; Giesy v. Railroad Co., 4 Ohio 308; Elizabeth etc.

R. Co. v. Helm, 8 Bush. 681. The law forbids the invasion of property hallowed by tender associations: our homes, our churches and our graves are preserved. Otherwise, rights are invaded without just compensation.

2. The construction of the act of 1849, is not to turn upon the question whether or not the railroad interferes with what may technically be termed the curtilage, but upon the question whether or not the location of the road will interfere with the reasonable and proper enjoyment of the house as a dwelling place. If this include adjacent out-buildings and grounds suitable and necessary for palace or hut, such out-buildings and grounds would be exempt. The narrow definition of curtilage, made by the master and court below, ignores the common-sense view of the act and makes it turn upon the location of a fence, which is erroneous: Shep. Touch., 94*; Carden v. Tuck, Cro. Eliz. 89; Hill v. Grange, 1 Plowd. 171; Patrick v. Lowre, 2 Brownl. 101; Emerton v. Selby, 2 Ld. Raym. 1015; Clements v. Collins, 2 Term. R. 502; United States v. Appleton, 1 Sumn. C. C. 492; Darby v. Jones, 27 Me. 357; Bennett v. Bittle, 4 R. 339; Rogers v. Smith, 4 Pa. 101; Savoy v. Jones, 2 R. 343.

3. There must be a curtilage of so much land as is necessary for the ordinary and useful purpose of the dwelling: Keppel v. Jackson, 3 W. & S. 323; Beam v. Church, 3 Clark 343; State v. Shaw, 31 Me. 523; State v. Wilson, Hayw. 242; People v. Taylor, 2 Mich. 250; Pond v. People, 8 Mich. 150; Lansing v. Caswell, 4 Paige 519; People v. Commissioners, 57 N. Y. 549. The act of 1849 positively prohibits a railroad passing through a dwelling-house. This court has decided, Swift and Given's Appeal, 111 Pa. 516, that the term "dwelling-house" includes, not only the four walls, but whatever ground and out-buildings are necessary for the reasonable use and enjoyment of it.

4. Public necessity cannot be urged as the ground for this invasion. It is not said that the defendant could not deflect its road so as to pass in the rear of plaintiff's house. When the legislature gives a railway company the right to interfere with the lawful possession of the owner of property, all the provisions of the act by which such powers and rights are conferred, must be considered with the greatest strictness; for, whatever

it does, the law does not give away any man's property for the benefit and gain of another: Barnes v. Railway Co., L. R. 27 Ch. D. 536.

*Mr. Wm. B. Broomall*, for the appellee:

In view of the decision in Swift and Given's Appeal, 111 Pa. 516, the word, dwelling-house, in the act of 1849, must be held to include, outside of the walls of the house, what is necessary for a reasonable and proper enjoyment of the house as a residence, in view of its location and surroundings. Statutes incorporating railroads, from 1831 to 1849 [cited], wherein the word, dwelling-house, is used, indicate that the intent of the expression was to include no more than the means of egress and ingress and of habitation while in the house. "A house, a church, a graveyard, or anything else, may be conveniently privileged in an act to incorporate a turnpike or a canal company, because it may be avoided without lessening the usefulness of the work; but every deflection from a right line in the bed of a railroad is proportionately productive of danger to property and life:" GIBSON, C. J., in Brocket v. Railroad Co., 14 Pa. 244. We now have a case where neither the dwelling-house nor any out-building is physically touched by the railroad. The approach to the house is practically the same as before. The sum of the offending is the construction of the railroad between the dwelling and the spring-house, and that in a country district.

OPINION, MR. JUSTICE GREEN:

It may be gravely questioned whether it is within the lawful power of the judiciary department of the government to depart from the plain letter of a statute which is free from ambiguity. As a general rule of course it cannot be, and is not done. When the words employed have a meaning, in legal contemplation, which is broader than the ordinary meaning, there is at least some justification for adopting the larger meaning where it is necessary in order to subserve the plain ends of justice. Acting upon this principle we did, in the case of Swift and Given's Appeal, 111 Pa. 516, hold, that the prohibitive words of the act of 1849, which forbade railroad companies from "passing through . . . . any dwelling-house in the occupancy

of the owner or owners thereof without his, her, or their consent," embraced some of the curtilage connected therewith. We did not decide how much of the curtilage was exempted, but said that question must be determined as each case arises "by a consideration of what is necessary for a reasonable and proper enjoyment of a house as a residence, in view of its location and surroundings." This language is perhaps open to the criticism of being somewhat indefinite, and may need a more accurate expression when the facts of some case coming before us may require it. But we certainly did mean to limit the curtilage to be exempted to that portion of it which was necessary to the enjoyment of the house, not to that which was desirable or convenient, or which depended alone upon the will of the owner.

Such a construction would have abrogated the act and practically put an end to the further building of railroads in this commonwealth. The case of Swift and Given's Appeal did not require a designation of the precise amount of curtilage to be exempted, because the part taken was about 150 feet distant from the dwelling-house, and, although within the same inclosure, was not essential to its enjoyment. But in the present case the ground taken is not within the same inclosure as the dwelling-house, and the master distinctly finds that it is not a part of the curtilage. He also finds that the route of the carriage-way to the dwelling is unchanged, that the railroad at the nearest point is more than one hundred feet from the dwelling and does not materially interfere with access thereto, nor with access to and use of the spring-house. Moreover, no outbuilding was taken, and the barn is fifty feet distant from the track of the road, and the road is not between the house and barn. The taking of out-buildings has never, in this commonwealth at least, been held a violation of the prohibitive words of the act of 1849, and we do not mean to intimate that it would or should be so held. But the fact that none are taken and communication between them and the dwelling is not interfered with in the present case, increases the difficulties of the apellant in his contention. We are aware of no principle upon which it would be possible for us to adopt the views pressed upon us on behalf of the appellant, without practically disregarding the plain provisions of the act of 1849, and inaugurat.

ing a policy which would lead to endless litigation, to the utmost uncertainty in the law, and to such an embarrassing prohibition upon the exercise of the commonwealth's right of eminent domain by our public improvement companies, as to greatly hinder if not quite suspend their further operations. We are entirely satisfied with the findings of the master and the action of the court in approving of them, and therefore have no basis upon which we could justify a reversal of either. An ample remedy in damages is furnished for every matter of inconvenience and injury which the appellant has sustained, and to that remedy it is his duty as a good citizen to resort.

Decree affirmed, and appeal dismissed at the cost of the appellant.